UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
DENNIS VITA and FXR CONSTRUCTION,
INC., individually and on behalf of all others
similarly situated,

                               Plaintiffs,

                 -against-

GENERAL MOTORS, LLC,

                           Defendant.
------------------------------------------------------------------X

**REPORT AND
RECOMMENDATION**
20-CV-1032 (JMA) (ARL)

**LINDSAY, Magistrate Judge:**

This putative class action lawsuit was commenced by the plaintiffs, Dennis Vita ("Vita")

and FXR Construction Inc. ("FXR"), seeking damages and equitable relief individually and on

behalf of class members who purchased or leased model year 2010–2014 General Motors LLC

("GM") vehicles fitted with GM's Generation IV 5.3 Liter V8 Vortec 5300 LC9 engines (the

"Generation IV engines").  Before the Court, on referral from District Judge Azrack, is the

motion of the defendant, GM, for summary judgment pursuant to Federal Rule of Civil

Procedure ("Rule") 56.  For the reasons set forth below, the Court respectfully recommends that

the motion be granted, in part.

## BACKGROUND

### A.    Factual Background

The following facts are drawn from the parties' Local Rule 56.1 Statements and are

uncontested unless otherwise noted.

### 1.    The Parties

Vita is the owner and President of FXR Construction, Inc. ("FXR").  Am. Compl. ¶ 25.

FXR is the owner of a 2013 GMC Sierra, equipped with a Generation IV engine, which was

purchased at the end of a lease from King O'Rourke Buick/GM in Smithtown, New York.  *Id.* ¶¶ 26-7.  Vita initially asserted that he was a co-owner of the vehicle.  *Id.* ¶ 26.  Vita now admits that he did not individually purchase or lease the truck.  Def.'s Rule 56.1 Stmt. n.1.  As discussed below, the undersigned recommends that all of Vita's claims be dismissed based on Vita's concession that he lacks Article III standing.  See Pl.'s Mem. at 1, n.1.  Accordingly, the balance of this report addresses only FXR's claims.

### 2.    The Generation IV Engine and the Evolution of its Design

The former General Motors Corporation ("Old GM") introduced the Generation IV engine for the 2007 model year.  Def.'s Rule 56.1 Stmt. ¶ 7.[1]  The Generation IV engine has an active fuel management ("AFM") system that improves fuel economy by deactivating four of the eight pistons when full power is not needed.  *Id.* ¶ 8.  The Generation IV engine family includes four models with different engine designs: the LC9 aluminum block engine with AFM; (ii) the LMG iron block engine with AFM; (iii) the LH9 engine without AFM and (iv) the LMF engine without AFM.  *Id.* ¶ 9.  This case involves alleged oil consumption issues found in the 2010 through 2014 model year trucks and SUVs with LC9 aluminum block engines.  Def.'s Mem. at 3.  Specifically, FXR alleges that the AFM system added to its Generation IV engine sprays oil into the engine's crankcase and onto the cylinder bores, creating an "oil tornado" within the crankcase, contributing to premature ring wear.  Pl.'s Rule 56.1 Add'l Facts ¶ 8.  GM disputes this contention.  Def.'s Counter to Rule 56.1 Add'l Facts ¶ 8

At any rate, the Generation IV engines have three piston rings: an upper compression ring ("UCR") that seals the combustion chamber, a lower compression ring ("LCR") that assists with

---

[1] GM acquired limited assets and liabilities previously held by Old GM through a Bankruptcy Sale Order dated July 10, 2009 under Chapter 11, Section 363 of the United States Bankruptcy Code.  Def.'s Counter to Rule 56.1 Add'l Facts ¶ 15.

sealing the combustion chamber and with ring stability, and an oil control ring ("OCR").  Pl.'s Rule 56.1 Add'l Facts ¶ 1.  The piston rings are coated with an anti-friction and anti-wear material and serve as seals that prevent oil from getting into the engine's combustion chamber and prevent blowby gasses (combustion gases that travel past the piston rings from the top) from reaching an engine's crankcase.  *Id.* ¶¶ 2, 9.  The parties dispute whether the coating used on the '278 piston ring in FXR's 2013 GMC Sierra or any of the other putative class vehicles was sufficiently robust.  *Id.* ¶ 9; Def.'s Counter to Rule 56.1 Add'l Facts ¶ 9.

Indeed, according to GM, there is no evidence that Old GM's pre-market testing of the Generation IV engine revealed any oil consumption issues.[2]  Def.'s Rule 56.1 Stmt. ¶ 10.  However, there is some evidence that by 2008, GM began to investigate an oil consumption defect associated with the Generation IV engines.  Pl.'s Rule 56.1 CounterStmt. ¶ 11.  FXR claims that this fact is very important because the issues raised in this litigation with respect to the  2011-2014 engines are very similar to issues GM was having with the 2007 model year engine.  *Id.* ¶ 12.  GM also acknowledges that its Current Production Improvement Team ("CPIT") closely monitored field performance through warranty data and other measures in order to address any performance issues.  Def.'s Rule 56.1 Stmt. ¶ 10.  But it claims that it was in 2009, not 2008, that the CPIT began to see warranty claims for the 2007 model year vehicles with LC9 aluminum block Generation IV engines involving oil consumption.  *Id.* ¶ 11.

As a result, at some point in 2009, GM asked dealerships to return certain 2007 LC9 engines to GM for "teardown" review.  *Id.* ¶ 12.  It also asked a group of engineers (the "Red-X"

---

[2] Engine oil must be supplied to the critical surfaces at sufficient volume and pressure to provide lubrication between metal surfaces and prevent premature wear.  Pl's Rule 56.1 Add.'l Facts ¶ 37.  When oil levels are low, metal components (such as pistons, main bearings, camshafts, and crankshafts) come into contact with each other, which can result in engine seizure and engine component damage.  *Id.* ¶ 38.  Inadequate lubrication and subsequent component failure can cause power loss and abnormal engine noise, shaking, vibration, and, ultimately, engine shutdown.  *Id.* ¶ 39.

team) to assess the root cause of oil consumption issues in those engines.  *Id.*  Red-X is a problem-solving approach used by GM to identify the root cause in complex systems.  *Id.* ¶ 13. To understand the root cause of the oil consumption issue in certain 2007 LC9 engines, the Red-X team compared the 2007 model year LC9 engines returned to GM by dealerships with complaints of excess oil consumption with 2007 model year LC9 engines that did not exhibit excess oil consumption.  *Id.* ¶ 14.  According to GM, none of the engines examined during this Red-X study had suffered a seizure event, fire, or any other potential safety risk.  *Id.* ¶ 15. However, it is clear from the Red-X report that, among other things, some engines showed heavy carbon buildup (burned and solidified engine oil) and worn top piston rings.[3]  Pl.'s Rule 56.1 CounterStmt. ¶ 15.

The Red-X team also looked at warranty data for model year 2005-2009 GM vehicles with small block V8 engines and found: (1) that the 2007 model year had a higher rate of oil consumption than all other model years combined and (2) most oil consumption complaints were associated with vehicles manufactured during a three-month period at the start of production for the 2007 model year, when a higher tension oil pump spring was used in the engine.  Def.'s Rule 56.1 Stmt. ¶ 16.  FXR notes that GM's warranty data charts also reflect complaints beyond the first three months of the model year 2007 production.  Pl.'s Rule 56.1 CounterStmt. ¶ 16. In addition, by May 2009, at least one engineer at old GM was looking into the possibility that the piston ring was contributing to excessive oil consumption.  Barnett Decl. Ex. 15. Nevertheless, after GM completed its engineering analysis, the Red-X team concluded that the primary root cause of oil consumption issues in the 2007 LC9 engine was the location of an AFM oil pressure relief valve in the crankcase, and the secondary cause was the higher tension

---

[3] The report noted that the path of oil consumption was past the piston rings.  Barnett Decl. Ex. 4.

oil pump spring used only in the first three months of production for the 2007 model year.[4]
Def.'s Rule 56.1 Stmt. *Id.* ¶ 17; *see* Ross Decl. Ex. 5.

Following the Red-X investigation, GM made a number of changes to the Generation IV
engines. Def.'s Rule 56.1 Stmt. ¶ 18. For example, at the start of production of the 2010 model
year, GM changed from the '251 piston ring to a more robust '278 piston ring to accommodate
E85 fuel standards. [5] *Id; see also* Pl.'s Rule 56.1 Add'l Facts ¶ 10. GM claims the change
resulted in a significant reduction in oil consumption complaints from model year 2010 forward.
Def.'s Rule 56.1 Stmt. ¶ 18. In contrast, FXR contends that there is some evidence that the '278
piston rings also wore prematurely in the field, some as early as 30,000 miles. Pl.'s Rule 56.1
Add.'l Facts ¶ 20.

In 2010, GM also added a metal "umbrella shield" to the AFM oil pressure relief valve
in the crankcase. Def.'s Rule 56.1 Stmt. ¶ 19. This shield directs oil away from the pistons and
into the oil pan, eliminating oil spray onto the pistons and cylinder walls where it could be pulled
up into the combustion chamber and consumed. *Id.* According to GM, this second design
change sufficiently addressed the root cause of the oil consumption issues in pre-2010
Generation IV engines. *Id.* ¶ 20. FXR disputes this fact. Pl.'s Rule 56.1 CounterStmt. ¶ 20. It
says that the first month after GM rolled out the AFM umbrella shield, its piston assembly
replacement warranty claims increased and continued to steadily ebb/flow at a rate higher than
that of the four months preceding the AFM shield addition. *Id.* FXR also points to a report
dated February 2010, in which a GM engineer notes that the "piston cleaning procedure" was

---

[4] FXR alleges that the Red X team confirmed its piston rings exhibited 100% full face wear. Pl.'s Rule 56.1 Add.'l
Facts ¶ 17. GM contends that the finding FXR is referring to only involves piston ring testing in Generation IV
engines with direct fuel injection systems found in model year 2014-2015 vehicles not at issue in this litigation.
Def.'s Counter to Rule 56.1 Add.'l Facts ¶ 17.
[5] According to one GM engineer, all piston rings wear but the '251 piston ring found in earlier model year vehicles
typically lasted well over 100,000 miles." Barnett Decl. Ex. 1 at 25:24-26:1. It is not clear how long the "278 piston
ring – the one found in the vehicle at issue in this litigation – lasted.

ineffective.  Pl.'s Rule 56.1 Add.'l Facts ¶ 22.  Nonetheless, it is undisputed that in August 2010, GM issued Technical Service Bulletin ("TSB") No. 10-06-01-008, instructing dealership technicians to test, free of charge, 2007 and 2008 model year engines and to free up piston rings and install the AFM shield on those vehicles found to be consuming excess oil.  Def.'s Rule 56.1 Stmt. ¶¶ 21, 23; Pl.'s Rule 56.1 Add'l Facts ¶ 21.  The TSB further instructed dealers to re-evaluate the vehicle for excess oil consumption after installing the new AFM shield and to replace the pistons and piston rings if oil consumption was still greater than 1 quart in 2,000 miles.  Def.'s Rule 56.1 Stmt. ¶ 24.  Finally, GM also installed the AFM valve shield in all Generation IV engines manufactured after October 21, 2010 and released it the same day as a service part for earlier-manufactured Generation IV engines.  Id. ¶ 21.  GM claims that once the umbrella shield and the '278 material piston rings were added, it saw a 75% drop in warranty claims for oil consumption in the 2010 model year Generation IV engine as compared to earlier years.  Id. ¶ 25.[6]

In 2011, GM change the engine design for a third time – this time adding a redesigned rocker cover, which relocated certain inlets and drains in order to more effectively separate oil particles from gases pulled from the crankcase through the engine's positive crankcase ventilation (PCV) system.  Id. ¶ 26.  According to GM, the improved design of the rocker cover more effectively separated oil from gas and directed the oil back to the oil pan, reducing the likelihood that oil could be vacuumed into the combustion chamber and consumed.  Id.  FXR contends that the redesigned valve cover did not effectively reduced oil consumption rates.  Pl.'s Rule 56.1 CounterStmt. ¶ 26.  In fact, FXR notes that, around that time period, oil consumption claims increased by about 500 claims.  Id.  In any case, GM installed the new rocker cover on all

---

[6] FXR insists that the AFM shield, alone, did not reduce piston assembly replacement warranty claims.  Pl.'s Rule 56.1 CounterStmt. ¶ 25.

vehicles manufactured after February 10, 2011 and made it available as a service part for earlier-manufactured Generation IV engines at no charge under warranty if any customer reported excess oil consumption in an earlier-manufactured Generation IV engine.  Def.'s Rule 56.1 Stmt. ¶ 27.

The CPIT continued to monitor warranty data on these design changes.  *Id.* ¶ 28.  The data reflects that the changes improved but did not completely cure the oil consumption issues. *Id.* ¶ 28; *see also* Barnett Decl. Ex. 6, 147:14-149:4.  Notably, GM claims that its warranty data for trucks and SUVs with Generation IV engines manufactured after February 10, 2011 shows that more than 97% of vehicles did not require piston repairs to address oil consumption issues.[7] *Id*. ¶ 29.  In a similar vein, GM's warranty engineer, Steven Pfromm ("Pfromm"), testified at his deposition that more than 98% of the subject vehicles had not experienced any problem with oil consumption and only 0.5% of vehicles needed the pistons replaced as a result of oil consumption.  Ross Decl. Ex. 3, 44:2-45:19.

Yet, Lisa Toth ("Toth"), another GM engineer, stated at her deposition that GM continued to receive oil consumption complaints after the company had begun installing the AFM valve shield in Generation IV engines.  Barnett Decl. Ex. 18, 166:1-69:14.  Similarly, Thomas Halka ("Halka"), also a GM engineer, testified at his deposition that he was aware of three to four 2012 model year LC9s with "oil fouled plugs" despite being outfitted with the new AFM cover and the PCV update.  *Id.* Ex. 1, 110:11-113:19.  Halka also testified his team was still discussing oil consumption problems after the AFM cover and PCV update, but that neither he nor his team were asked to further investigate the issue.  *Id.* Ex. 1, 114:8-23.  In addition, in late 2013, Halka advised a piston supplier that "[GM is] still getting Gen IV LC9 engines

---

[7] FXR disputes the accuracy of GM's warranty information.  Pl.'s Rule 56.1 CounterStmt. ¶ 29.

returned due to poor oil consumption." *Id.* Ex. 14.  Finally, Pfromm engaged in an email discussion with colleagues during which they discussed the fact that, in an unspecified number of vehicles, they were "[s]till seeing what looks like oil pull over on 2012 engines with post BP valve covers." *Id.* Ex. 23.  He then noted in a second email exchange that "the new valve cover baffle does not completely kill the [leaky lifters]. *Id.* Ex. 24.  As such, FXR claims that the testimony of GM's engineers is evidence of the fact that GM knew of the defect and did not act to remedy this issue or provide its customers with an effective warranty repair.  Pl.'s Rule 56.1 Add'l Facts ¶ 36.

In any case, notwithstanding all of the design changes, in 2013, GM observed a small increase in oil consumption warranty claims for 2012 and 2013 model year vehicles.  Def.'s Rule 56.1 Stmt. ¶ 30.  GM claims that it traced those claims to engines produced at its manufacturing facility in Silao, Guanajuato, Mexico, and discovered that there had been a short-term quality spill by the supplier of rocker covers used at that manufacturing plant.  *Id.*  Specifically, it appears that its supplier, Auma, had failed to use enough RTV sealant on the rocker cover, which allowed oil to leak out of the baffle.  *Id.*  As such, in November 2014, GM issued an updated technical service bulletin, No. 10-06-01-008M, providing instructions to dealerships to test and, if necessary, replace the rocker cover for 2012 and 2013 model year vehicles with Generation IV engines with oil consumption concerns.  *Id.* ¶ 31.

In addition, the record makes clear that approximately one year earlier, Halka had also emailed a piston ring supplier indicating that GM was still getting Generation IV LC9 engines returned due to poor oil consumption.  Barnett Decl. Ex. 14.  In fact, in the email, Halka indicated that the problem with the Generation IV LC9 engines was "very similar to the 2007 M.Y. issue – full face top ring [wear] at 30k to 50k miles. . . . " *Id.*  In July 2014, a different GM

8

engineer then wrote to Halka stating, "We would love to see a move for service rings. We continue to see alum[inum] blocks up through 2013 with oil consumption." *Id.* Ex. 5. Halka responded "[y]es, we should. Gen IV still has problems." *Id.* Ex. 25. Accordingly, in 2014, GM began installing a more robust PVD coated ring during warranty replacements – the '525 material ring. Pl.'s Rule 56.1 Add'l Facts ¶ 12. GM contends that the change to PVD rings in warranty repairs was a "commercial change" that was not made as part of "an effort to cure [oil] consumption." Def.'s Counter to Rule 56.1 Add.'l Facts ¶ 12.

### 3. FXR's Vehicle

As noted above, on February 28, 2013, FXR leased a new 2013 GMC Sierra from King O'Rourke Chevrolet. Def.'s Rule 56.1 Stmt. ¶ 33. The parties dispute the details of the discussion that took place between the salesman and Vita before FXR leased the truck, but it is undisputed that Vita was attracted to the vehicle because it was "fully loaded," good looking and American-made. *Id.* ¶ 34. It is also undisputed that the salesman made Vita aware of the truck's expected fuel economy and advised him that the 2013 Sierra was covered by GM's New Vehicle Limited Warranty in place at the time of purchase. *Id.* ¶ 35. Finally, it is undisputed that the GM New Vehicle Limited Warranty issued for the model year 2013 GMC Sierra provides that the warranty "covers repairs to correct any vehicle defect, not slight noise, vibrations, or other normal characteristics of the vehicle related to materials or workmanship occurring during the warranty period." Pl.'s Rule 56.1 Add'l Facts ¶ 54.

When FXR's vehicle had approximately 80,000 miles on the odometer, Vita noticed the truck was "consuming oil" while he was driving on the Long Island Expressway. Def.'s Rule 56.1 Stmt. ¶¶ 37-8. Specifically, the truck emitted a cloud of blue smoke. *Id.* ¶ 38. At the time, the truck was still under lease and warranty. *Id.* ¶ 37. Vita brought the truck to his personal

mechanic at Lobato Auto Service, who found a bulletin concerning the Generation IV engines and told him to take the vehicle to King O'Rourke Chevrolet for service.[8]  *Id*. ¶ 39.  When Vita took the vehicle to the dealer, an unnamed individual told him to change the valve covers, so he purchased the parts and brought them back to Lobato Auto Service for installation.  *Id*. ¶ 40.  Around this time, Vita also started changing the vehicle's spark plugs every few months as part of his routine maintenance.  *Id*. ¶ 41.  Notably, by that point GM had already generated a Problem Investigation report which documented oil fouled spark plugs and misfire conditions in the 2012-2013 vehicles with the Generation IV engines.  Pl.'s Rule 56.1 Add'l Facts ¶ 43.  Then, sometime between 2014 and 2017, King O'Rourke Chevrolet replaced the oil pump in the truck, and on two unspecified occasions, Lobato Auto Service replaced the oil sending unit.  Def.'s Rule 56.1 Stmt. ¶ 42.

When the lease expired in April 2016, FXR purchased the truck from King O'Rourke Chevrolet for $29,107.66.  *Id*. ¶ 43.  At the time, the truck was three years old and had 120,959 miles on the odometer; more than 80,000 miles over the total mileage allowed under the lease agreement.  *Id*. ¶ 44.  Prior to the purchase, it is clear that Vita was aware of at least one technical service bulletin related to the vehicle's valve covers and he was regularly replacing spark plugs.  *Id*. ¶ 45; Pl.'s Rule 56.1 CounterStmt. ¶ 45.

Although the vehicle's engine never shut down or caught fire during the many years that FXR has leased and owned this vehicle, Vita does contend that the engine repeatedly misfired – a problem he was attempting to remedy with frequent spark plug replacement.[9]  Def.'s Rule 56.1 Stmt. ¶ 47; Pl.'s Rule 56.1 CounterStmt. ¶ 47.  Vita also claims that, at some point, he started

---

[8] Vita never contacted GM directly about the 2013 Sierra.  Def.'s Rule 56.1 Stmt. ¶ 36.
[9] Halka testified that it might be possible for a vehicle with oil-fouled spark plugs to experience reduced engine torque under certain conditions.  Ross Decl. Ex. 1 at 84:2-85:4.

adding a quart of oil every three days.   Pl.'s Rule 56.1 Add'l Facts ¶ 51.  Nevertheless, Vita never had an oil consumption test performed on the truck and, at no point, was he ever told that the repair of the oil pump or oil sending unit had anything to do with oil consumption.  Def.'s Rule 56.1 Stmt. ¶ 48.

FXR still owns the Sierra, and at nine years old, it has well over 240,000 miles on the odometer.  *Id*. ¶ 49.  In fact, Vita's daughter has driven the truck daily for the last few years.  *Id*. ¶ 50.  In May 2021, FXR purchased a used 5.3-liter engine online and paid Lobato Auto Service to install it.  *Id*. ¶ 51.  FXR contends that the damage to its vehicle's original engine was caused by excessive oil consumption which occurred because the piston ring wore out and lost its sealing capacity.[10]  Pl.'s Rule 56.1 Add'l Facts ¶ 5.  To this end, FXR argues that piston ring wear can cause oil consumption in two ways.  *Id*. ¶ 6.  First, FXR claims that oil is allowed to travel past the compromised piston rings from the crankcase below, burning in the combustion chamber during the combustion stroke.  *Id.*   Second, blowby that reaches the crankcase blends with oil in the crankcase, creating a mist of oil and exhaust gas.  *Id*. ¶ 7.  GM disputes these facts and emphasizes that there is no evidence that FXR's engine replacement involved any issue with the vehicle's piston rings.  Def.'s Counter to Rule 56.1 Add'l Facts. ¶ 7.

## B.    Procedural History

Vita initially asserted his New York claims on August 31, 2017 in an amended complaint filed in a multi-state putative class action in the Northern District of California.  Def.'s Rule 56.1 Stmt. ¶ 1.  On February 11, 2020, the California court dismissed Vita's claims for lack of personal jurisdiction without ruling on the viability of his claims under New York law or his

---

[10] According to FXR, drivers are unaware when the oil is low in their vehicles because the oil pressure sensor does not alert drivers of low oil pressure until pressure falls to 9 psi, far below GM's minimum oil pressure specification of 35 psi at 2000 rpms (cruising speed).  Pl.'s Rule 56.1 Add'l Facts ¶¶ 44-5.

specific alleged facts. *Id.* ¶ 2, Vita refiled his claims in this Court on February 25, 2020. ECF No. 1. On March 22, 2021, FXR Construction, Inc. ("FXR") filed an unopposed motion to intervene as plaintiff. ECF No. 25. That motion was granted on October 29, 2021. ECF No. 29. On November 10, 2021, FXR and Vita filed their First Amended Class Action Complaint, the operative pleading in this case. ECF No. 30.

On May 12, 2022, GM filed the instant motion for summary judgment and a corresponding motion to seal certain documents.[11] The motion was referred to the undersigned on October 20, 2022.

## DISCUSSION

### A.    Standards of Law

"'Summary judgment is appropriate where there are no genuine disputes concerning any material facts, and where the moving party is entitled to judgment as a matter of law.'" *Puglisi v. Town of Hempstead*, No. 10 CV 1928, 2012 WL 4172010, *6 (E.D.N.Y. Sept. 17, 2012) (quoting *In re Blackwood Assocs., L.L.P.,* 153 F.3d 61, 67 (2d Cir. 1998) and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56(c)). In deciding a summary judgment motion, the district court must resolve all ambiguities and draw all reasonable inferences in the light most favorable to the opposing party. *See Castle Rock Entm't, Inc. v. Carol Publ'g Group, Inc*., 150 F.3d 132, 137 (2d Cir. 1998). If there is evidence in the record as to any material fact from which an inference could be drawn in favor of the non-movant, summary judgment is unavailable. *See Holt v. KMI-Continental, Inc*., 95 F.3d 123, 129 (2d Cir. 1996), *cert denied*, 520 U.S. 1228 (1997).

The trial court's responsibility is "limited to discerning whether there are any genuine

---

[11] The undersigned has reviewed the motion to seal and recommends that it be granted.

issues of material fact to be tried, not to deciding them.  Its duty, in short, is confined at this point

to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Servs.,*

*L.P.,* 22 F.3d 1219, 1224 (2d Cir. 1994).  When, however, there is nothing more than a

"metaphysical doubt as to the material facts," summary judgment is proper.  *Matsushita Elec.*

*Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  "[T]here must exist 'specific facts

showing that there is a genuine issue for trial' in order to deny summary judgment as to a

particular claim." *Jamaica Ash & Rubbish v. Ferguson*, 85 F. Supp. 2d 174, 180 (E.D.N.Y.

demonstrating that little or no evidence may be found in support of the non-moving party's case.

Accordingly, "[w]hen no rational jury could find in favor of the nonmoving party because the

evidence to support its case is so slight, there is no genuine issue of material fact and a grant of

summary judgment is proper."  *Marks v. New York Univ.*, 61 F. Supp. 2d 81, 88 (S.D.N.Y.

1999).

### B.    Article III Standing

A plaintiff invoking the jurisdiction of the federal courts must demonstrate that

he/she/they has standing under Article III "for each claim [he/she/they] seeks to press." *Axon v.*

*Citrus World, Inc.*, 354 F. Supp. 3d 170, 176 (E.D.N.Y. 2018), *aff'd sub nom. Axon v. Florida's*

*Nat. Growers, Inc*., 813 F. App'x 701 (2d Cir. 2020) (citing *DaimlerChrysler Corp. v. Cuno*, 547

U.S. 332, 352, 126 S. Ct. 1854, 164 L. Ed. 2d 589 (2006)).  "To satisfy the irreducible

constitutional minimum of [Article III] standing, a plaintiff must demonstrate (1) a personal

injury in fact (2) that the challenged conduct of the defendant caused and (3) which a favorable

decision will likely redress." *In re Frito-Lay N. Am., Inc. All Nat. Litig*., No. 12-MD-2413 RRM

RLM, 2013 WL 4647512, at *11 (E.D.N.Y. Aug. 29, 2013) (citing *Mahon v. Ticor Title Ins. Co*.,

683 F.3d 59, 62 (2d Cir. 2012)).  If a plaintiff lacks Article III standing, the Court has no subject

13

matter jurisdiction to hear the plaintiff's claim.  *Id.*  Notably, "these rules are no less true for plaintiffs representing putative classes."  As previously indicated, Vita acknowledges that he did not individually purchase or lease the truck at issue in this case.  Def.'s Rule 56.1 Stmt. n.1.  Accordingly, Vita lacks Article III standing and the undersigned respectfully recommends that all of his claims be dismissed.

With respect to FXR, GM claims that the corporate plaintiff lacks Article III standing to pursue injunctive relief.  A plaintiff seeking prospective injunctive relief must prove the likelihood of future or continuing harm.  *Atik v. Welch Foods, Inc.,* No. 15 CIV 5405 MKB VMS, 2016 WL 11480151, at *3 (E.D.N.Y. Aug. 5, 2016), report and recommendation adopted, No. 15 CV 5405 MKB VMS, 2016 WL 5678474 (E.D.N.Y. Sept. 30, 2016) (citing *Shain v. Ellison*, 356 F.3d 211, 215 (2d. Cir. 2004) (a plaintiff seeking injunctive relief "cannot rely on past injury to satisfy the injury requirement but must show a likelihood that he will be injured in the future.")).  Indeed, it is well-settled that "[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief." *Id.* (quoting *O'Shea v. Littleton*, 414 U.S. 488, 495-96, 94 S. Ct. 669, 676 (1974)).  GM contends that FXR has made clear that it would not have purchased the 2013 Sierra if it had known about the alleged oil consumption defect.  GM argues, therefore, that it is reasonable to infer that now that FXR is aware of the alleged defect, it will not purchase a 2013 Sierra or any other putative class vehicle again.  The Court agrees.  The fact that FXR has been injured by its prior purchase of the 2013 Sierra is insufficient to support a claim for injunctive relief.  Given the fact that FXR is now aware of the alleged defect as well as GM's alleged misrepresentations concerning the oil consumption issue, there is no danger that it will again be deceived by GM.  *See id.* (citing *Elkind v. Revlon Consumer Products Corp*., No. 14 Civ. 2484, 2015 WL 2344134, at *3 (E.D.N.Y. May 14,

2015)); *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 239 (2d Cir. 2016)("Although past injuries may provide a basis to seek money damages, they do not confer standing to seek injunctive relief unless the plaintiff can demonstrate that [it] is likely to be harmed again in the future in a similar way.").[12]  Accordingly, the undersigned also recommends that FXR's claim for injunctive relief be dismissed.

Finally, GM argues that FXR also lack standing to pursue a claim under the Magnuson-Moss Warranty Act ("MMWA") on behalf of a nationwide class because that claim is based on the laws of states where FXR does not reside and has suffered no injury.  "The MMWA grants relief to a consumer 'who is damaged by the failure of a . . . warrantor . . . to comply with any obligation . . . under a written warranty.'" *Wilbur v. Toyota Motor Sales, U.S.A., Inc.*, 86 F.3d 23, 26 (2d Cir. 1996) (citing 15 U.S.C. § 2310(d)(1)(1994)).  Essentially, the MMWA "incorporates and federalizes state-law breach of warranty claims, including state-law standards for liability and damages." *Grossman v. Simply Nourish Pet Food Co*. LLC, 516 F. Supp. 3d 261, 284 (E.D.N.Y. 2021) (citing *Sitt v. Nature's Bounty, Inc.,* No. 15-cv-4199 (MKB), 2016 WL 5372794 at *17. (E.D.N.Y. Sept. 26, 2016)).  As such, the applicability of the statute is directly dependent upon a sustainable state law claim for breach of warranty.  *See McKee v. Gen. Motors LLC*, 376 F. Supp. 3d 751, 760 (E.D. Mich. 2019).

In this case, FXR has not alleged injuries in any state other than New York.  Accordingly, the only claim that can be "federalized" is a New York state breach of warranty claim.  In the

---

[12] It warrants mention that some Court's in this District have suggested that there is a public-policy exception to the requirement of a future continuing injury in consumer protection cases.  *Atik,* 2016 WL 11480151, at *3 (citing *Belfiore v. Procter & Gamble Co*., 94 F. Supp. 3d 440, 445-46 (E.D.N.Y. 2015) ("Public policy, as well as precedent, supports the rule that Article III standing exists to seek injunctive relief. . ..  To hold otherwise would denigrate the New York consumer protection statute, designed as a major support of consumers who claim to have been cheated").  However, the undersigned declines to follow those cases and finds the analysis of the *Atik* court to be compelling.

cases in which courts have chosen to address the standing issue prior to class certification, courts have held that named plaintiffs lack standing to assert claims under the laws of the states in which they do not reside or in which they suffered no injury.  *See e.g., In re Packaged Ice Antitrust Litig.,* 779 F. Supp. 2d 642, 657 (E.D. Mich. 2011).  Moreover, this precedent applies equally where plaintiffs have asserted nationwide-class Magnuson-Moss Warranty Act claims because . . .warranty claims under the [MMWA] arise out of and are defined by state law." *See In re Takata Airbag Prod. Liab. Litig.*, 462 F. Supp. 3d 1304, 1335 (S.D. Fla. 2020).  Thus, the undersigned further recommends that FXR's nationwide-class MMWA claim also be dismissed for lack of standing.

### C.    The Design Defect

GM argues next that FXR cannot establish the essential elements of any of its claims without reliable evidence from a qualified expert who has examined FXR's specific vehicle and found it to be defective.  Specifically, GM asserts that all of FXR's claims (MMWA, unfair and deceptive trade practice, breach of express warranty, breach of implied warranty, fraudulent omission and unjust enrichment) are based on the vague allegation that its 2013 GMC Sierra has an unspecified piston ring defect that results in excessive oil consumption.  Yet, according to GM, the opinion proffered by FXR's expert, Dr. Werner J.A. Dahm, an aerospace engineer, is inadmissible because Dr. Dahm never examined FXR's vehicle or any other putative class vehicle and cannot explain how the piston rings are allegedly "incorrect" or how the purported defect allegedly causes excess oil consumption.  In addition, GM maintains that FXR has not produced a single document mentioning repairs or performance issues related to oil consumption, let alone any issue with the vehicle's piston rings.

The Court addresses first GM's claim that Dr. Dahm's expert testimony cannot be used to

defeat summary judgment. GM correctly notes that "[i]n order to prove liability grounded upon

a design defect, New York law requires plaintiffs to proffer expert testimony as to the feasibility

and efficacy of alternative designs." *Lara v. Delta Int'l Mach. Corp.*, 174 F. Supp. 3d 719, 740

*(E.D.N.Y. 2016)* (citing *Cuntan v. Hitachi KOKI USA, Ltd.*, No. 06–CV–3898, 2009 WL

3334364, at *6 (E.D.N.Y. Oct 15, 2009) (collecting cases)). In fact, it is well-settled that "[a]

party cannot survive summary judgment on a design defect claim without admissible expert

testimony." *Frazer v. ITW Food Equip. Grp. LLC*, No. 11 CV 9699, 2013 WL 6164486, at *5

(S.D.N.Y. Nov. 22, 2013).[13] For this reason, as a general rule, the undersigned would have first

addressed GM's claim that Dr. Dahm is not qualified to render an expert opinion as to whether

the design of the Generation IV engine was defective. However, in this case, that argument is

not ripe.

On February 25, 2022, GM requested a pre-motion conference before District Judge

Azrack on its proposed motion to exclude the opinions and testimony of Dr. Dahm. GM's

premotion conference letter raised many of the same arguments it asserts in the instant motion.

FXR responded to the premotion conference letter and provided a brief summary of Dr. Dahm's

qualification and his methodologies. Notwithstanding the parties' arguments, on March 30,

2023, District Judge Azrack denied GM's request for a premotion conference without prejudice

to be refiled after a decision on the summary judgment motion. The undersigned must, therefore,

infer from that ruling that District Judge Azrack intended to address the *Daubert* issues raised by

---

[13] In order to establish its MMWA or its breach of express or implied warranty claims, FXR must show that the product at issue was defective and that the defectively designed product was the actual and proximate cause of its injury. *Lara.*, 174 F. Supp. 3d 719, 740 (E.D.N.Y. 2016). To this end, "[t]here are three types of defects recognized under New York law: (1) design defects ; (2) manufacturing defects; and (3) defective or inadequate warnings." FXR appears to be relying on the first type of defect. Specifically, FXR claims that a defect in the design of the Generation IV engine in its 2013 Sierra allowed oil to spray into the engine's crankcase and onto the cylinder bores, creating an "oil tornado" within the crankcase, which contributed to premature ring wear and ultimately resulted in the need to replace the engine.

GM following a determination of the instant motion.

FXR appears to have reached the same conclusion because in response to GM's instant design defect argument, FXR simply argues that "once the Court considers *Daubert* motions, FXR can explain how Dr. Dahm has addressed the issues that led to a few of his opinions being excluded in a related action."  Accordingly, the Court will not consider the potential inadmissibility of Dr. Dahm's opinions as a basis to grant summary judgment on any of the design defect claim.

GM also argues that FXR has not produced any evidence that its car was repaired or suffered from performance issues related to oil consumption, let alone any issue with the vehicle's piston rings.   Towards this end, GM notes that none of the repair invoices submitted by FXR suggest that the car had an oil consumption issue.  For example, the April 20, 2013 invoice from King O'Rourke reflects that a transfer case was replaced under warranty.  Ross Decl. Exs. 34, 35.  Similarly, the March 23, 2015 estimate from King O'Rourke appears to be for work performed on the front bumper, bed and rear bumper.  *Id*. Ex. 36.  In addition, the November 17, 2015 invoice from Walmart Auto Care Center appears to be for routine maintenance.  *Id*. Ex. 37.

However, GM's argument makes short shrift of the record.   To begin with, it is undisputed that when FXR's vehicle had approximately 80,000 miles on the odometer, Vita noticed the truck was "consuming oil" while he was driving on the Long Island Expressway. Def.'s Rule 56.1 Stmt. ¶¶ 37-8.  Vita took the vehicle to a dealer and an unnamed individual told him to change the valve covers.  *Id.* ¶ 40.  It is also undisputed that, around this time, Vita started checking his oil every other day and changing the vehicle's spark plugs every few months arguably consistent with a documented problem with oil fouled spark plugs and misfire

conditions in the 2012-2013 vehicles with the Generation IV engines.  Pl.'s Rule 56.1 Add'l Facts ¶ 43.

In addition, at some point, FXR was required to replace the oil pump in the truck, and on two unspecified occasions, replace the oil sending unit.  Def.'s Rule 56.1 Stmt. ¶ 42.  Finally, while FXR may not be able to ultimately prove that it was related to the alleged oil consumption issue, the fact remains that in May 2021, FXR was required to install a used 5.3-liter engine in the vehicle.  *Id.* ¶ 51.  This testimony coupled with the multitude of engineering reports indicating that oil consumption was an issue GM was investigating, leads the undersigned to conclude that there is a genuine issue of material fact as to whether the design of the Generation IV engines was defective.  The Court, therefore, turns to its attention to FXR's individual claims.

### D.    Unjust Enrichment

 FXR contends that it has a viable unjust enrichment claim.  The undersigned disagrees.  Courts routinely dismiss unjust enrichment claims that simply duplicate, or replace, conventional contract or tort claims. *Twohig v. Shop-Rite Supermarkets, Inc.,* 519 F. Supp. 3d 154, 168 (S.D.N.Y. 2021) (citing *Ebin v. Kangadis Food Inc.*, No. 13-CV-2311, 2013 WL 6504547, at *7 (S.D.N.Y. Dec. 11, 2013)(dismissing unjust enrichment claim as duplicative of, among other things, breach of warranty claim); *Reynolds v. Lifewatch, Inc.,* 136 F. Supp. 3d 503, 524 (S.D.N.Y. 2015) (granting motion to dismiss plaintiff's unjust enrichment claim as duplicative of § 349 and fraud claims).  Here, FXR has failed to sufficiently explain how the unjust enrichment claim is not merely duplicative of its other causes of action.  Indeed, in support of its unjust enrichment claim, FXR argues, as it does with its other claims, that it "paid for a non-defective vehicle, but it received a vehicle with defective piston rings that requires FXR to add up to a quart of oil every three days."  Pl.'s Mem. at 12.  FXR similarly argues that

19

the oil consumption defect has caused FXR to incur significant repair expenses, including having to replace dozens of spark plugs and pay for a new engine. *Id.* at 13.

At best, FXR appears to be arguing that even if its unjust enrichment claim is duplicative, the Court should permit it to stand just in case GM succeeds in arguing that the alleged defect falls outside of the scope of the express warranty. However, the circumstances pursuant to which courts permit plaintiffs to plead unjust enrichment as an alternative theory of recovery are limited. *See e,g. Buonasera v. Honest Co*., Inc., 208 F. Supp. 3d 555, 567–68 (S.D.N.Y. 2016) (noting that while the existence of a contract governing a particular subject matter ordinarily precludes recovery in quasi-contract for events arising out of the same subject matter, where there is a bona fide dispute as to the existence of a contract or where the contract does not cover the dispute in issue, plaintiff may proceed upon a theory of quantum meruit). In this case, the parties do not dispute the existence of the limited express warranty claim. More importantly, FXR has asserted both fraud and deceptive practices claims covering the same set of facts. As such, the undersigned finds the unjust enrichment claim to be duplicative and respectfully recommends that it be dismissed.

### E.    Breach of Express and Implied Warranties and the MMWA

The Court turns its focus to the plaintiff's warranty claims. FXR has asserted three different warranty claims – breach of express warranty, breach of implied warranty and a violation of the MMWA, 15 U.S.C. § 2301.

### 1.    Express Warranty

"In New York, 'a cause of action on an express warranty asks only that a manufacturer make good on the contractual commitment that it voluntarily undertook by placing that warranty on its product.'" *Boateng v. Bayerische Motoren Werke Aktiengesellschaft*, No. 17 CV 00209

KAM SIL, 2022 WL 4357555, at *22 (E.D.N.Y. Sept. 20, 2022) (citing *Bates v. Dow Agrosciences, L.L.C.,* 544, U.S. 431, 444 (2005)).  "To prevail on an express warranty claim, a [p]laintiff must demonstrate that the 'affirmation of fact or promise by the seller' was to 'induce the buyer to purchase and that the warranty was relied upon[.]'" *Id.* (citing *Schimmenti v. Ply Gem Indus.*, 156 A.D.2d 658, 659 (2d Dept. 1989)).  In addition, "'[a]n express warranty is interpreted like a contract, and a [p]laintiff can provide evidence of the warranty through various means.'" *Id.* (citing *Mill Printing & Lithography Corp. v. Solid Waste Management Systems, Inc.*, 65 A.D. 590, 590-91 (2d Dept. 1978)).

In this case, FXR received a limited express warranty when it purchased the vehicle. That warranty covers "repairs to correct any vehicle defect, not slight noise, vibrations, or other normal characteristics of the vehicle related to materials or workmanship occurring during the warranty period."  Ross Decl. Ex. 35.  GM contends that the particular defect of which FXR complains - an unspecified piston ring defect that results in excessive oil consumption – is a design defect, not a material or workmanship defect, and is therefore not covered under the warranty.  Under New York law, "[a] defectively designed product is one which, at the time it leaves the seller's hands, is in a condition not reasonably contemplated by the ultimate consumer and is unreasonably dangerous for its intended use; that is one whose utility does not outweigh the danger inherent in its introduction into the stream of commerce.'" *Lara.*, 174 F. Supp. 3d at 740 (E.D.N.Y. 2016) (citing *Scarangella v. Thomas Built Buses, Inc*., 93 N.Y.2d 655, 659, 695 N.Y.S.2d 520, 522, 717 N.E.2d 679, 681 (1999)).  In other words, the product as designed was unreasonably dangerous for its intended use.  In contrast, "[a] manufacturing defect results when a mistake in manufacturing renders a product that is ordinarily safe dangerous so that it causes harm. . .." *Haag v. Hyundai Motor Am*., 294 F. Supp. 3d 102, 104–05 (W.D.N.Y. 2018) (citing

*McCarthy v. Olin Corp.*, 119 F.3d 148, 154–55 (2d Cir. 1997)).

"It is well settled that where, as here, a warranty protects against defects in 'materials or workmanship,' the warranty covers manufacturing defects, but not design defects." *Id.* (citing *Miller v. Hyundai,* 2017 WL 4382339, at *4, 2017 U.S. Dist. LEXIS 161729, at *11–*12 (S.D.N.Y. 2017); *Catalano v. BMW of North America, LLC*, 167 F.Supp.3d 540, 545–55 (S.D.N.Y. 2016); *Garcia v. Chrysler Group LLC*, 127 F.Supp.3d 212 at 227–28 (S.D.N.Y. 2015)).  Nonetheless, FXR contends that the Court should consider the oil consumption defect as both a design and a manufacturing defect.  The undersigned disagrees.  The amended complaint alleges quite clearly that, as designed, the Generation IV engine "consumes an abnormally and improperly high quantity of oil that far exceeds industry standards for reasonable oil consumption [and this] excessive oil consumption results in low oil levels, insufficient lubricity levels, and corresponding internal engine component damage."  Am. Compl. ¶ 5.  Indeed, FXR has repeatedly asserted that the design of the Generation IV engine permits excessive oil consumption because the piston rings installed in the engines wear and lose sealing capacity, and thus, fail to keep oil in the crankcase.  Pl.'s Add'l Facts ¶ 5.  In fact, in its opposition to the motion, FXR even argues that "the piston rings that GM installed in the Gen IV 5.3L engines prematurely wear and lose sealing capacity thereby failing to achieve *their intended purpose*."  Pl.'s Mem. at 17 (emphasis added).  This is precisely the type of claim that courts have interpreted to be design defects.  *See Miller*, 2017 WL 4382339, at *4 ("The critical difference between manufacturing defects and design defects is the intention of the manufacturer.").  FXR is not claiming that the rings in its particular vehicle were faulty or that they were somehow incorrectly installed – FXR is claiming that GM intentionally designed the Generation IV engines with piston rings that failed to keep oil out of the crankcase.  Accordingly, the Court

respectfully recommends that FXR's breach of express warranty claim be dismissed.[14]

## 2.    Implied Warranty

FXR has also asserted a claim for breach of implied warranty of merchantability under the laws of New York.  Section 2–725 of the Uniform Commercial Code ("UCC"), which has been adopted in New York, governs a cause of action for breach of implied warranty for the sale of goods.  *Barban v. Rheem Textile Sys., Inc.,* No. 01-CV-8475 (ILG), 2005 WL 387660, at *10 (E.D.N.Y. Feb. 11, 2005), *aff'd,* 147 F. App'x 222 (2d Cir. 2005)).  Section 2-314 of the UCC sets forth the fundamental rule that "a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind," *Cummings v. FCA US LLC,* 401 F. Supp. 3d 288, 309 (N.D.N.Y. 2019).  However, "'New York law allows claims of implied warranty to be brought only by those in privity with the named defendant." *Id.* (citing *Jackson v. Eddy's LI RV Center, Inc*., 845 F. Supp. 2d 523, 530 (E.D.N.Y. 2012)); *see also Lexow & Jenkins, P.C. v. Hertz Commercial Leasing Corp.,* 122 A.D.2d 25, 26 (2d Dep't 1986) ("It is now settled that no implied warranty will extend from a manufacturer to a remote purchaser not in privity with the manufacturer where only economic loss and not personal injury is alleged."); *Catalano v. BMW of N. Am., LLC*, 167 F. Supp. 3d 540, 556 (S.D.N.Y. 2016)("Although New York has long since dispensed with the privity requirement for express warranty claims, New York courts continue to require privity between a plaintiff and defendant with respect to claims for breach of the implied warranties of merchantability. . ..")(internal citation omitted)).  In this case, there is no privity between FXR and GM.  FXR purchased the

---

[14] It warrants mention that the undersigned finds FXR's grammatical structure argument to be without merit.  FXR's argument based on the placement of a comma suggests that GM intended to warranty "any defects" with the exception of (1) not slight noise (2) vibrations or (3) other . . . characteristics of the vehicle related to materials or workmanship.  In other words, FXR's interpretation would force the Court to conclude that GM did not promise to cover faulty materials of workmanship.  The Court does not find this to be a fair read of the provision.

vehicle from King O'Rourke Chevrolet, an independent dealership.  Accordingly, the undersigned further recommends that FXR's breach of implied warranty claim be dismissed.

### 3.    MMWA

"Claims under the Magnuson–Moss Act stand or fall with the express and implied warranty claims under state law." *Chiarelli v. Nissan N. Am., Inc*., 2015 WL 5686507, at *9 (E.D.N.Y. Sept. 25, 2015) (quoting Clemens v. DaimlerChrysler Corp., 534 F.3d 1017, 1022 (9th Cir. 2008)).  Because the Court has determined that FXR's express and implied warranty claim should be dismissed, the undersigned recommends that FXR's MMWA claim be dismissed as well.

### G.    Fraudulent Omission

FXR has also asserted a claim for fraudulent omission.  Specifically, FXR asserts that GM was aware of the oil consumption defect when it marketed and sold vehicles containing the Generation IV engine but failed to disclose those defects to consumers.  Am. Compl. ¶ 203.  To this end, FXR argues that by as early as 2008, GM began to investigate an oil consumption defect associated with the Generation IV engines.  Pl.'s Rule 56.1 CounterStmt. ¶ 11.  FXR claims that this fact is very important because the issues it had with the engine in its 2013 Sierra were very similar to issues GM was having with the 2007 model year engine and across the product line.  Pl.'s Rule 56.1 CounterStmt. Id. ¶ 12.  Indeed, GM admits that by 2009, the CPIT began to see warranty claims for the 2007 model year vehicles with LC9 aluminum block Generation IV engines involving oil consumption.  Def.'s Rule 56.1 Stmt. ¶ 11.  FXR also points to all of the changes that were made to the Generation IV engine to address ring wear and the oil consumption issue – changes which FXR claims had not resolved the defect by the time FXR leased or purchased its vehicle.  *See* Def.'s Rule 56.1 Stmt. ¶ 18.  Finally, FXR claims that

having been aware of the oil consumption defect, and having known that FXR and the other members of the putative class could not have reasonably been expected to know of the issue, GM had a duty to disclose the defect to FXR and the other members of the putative class. *Id.* ¶ 204.

"To plead a claim for fraud, the plaintiff must allege '(1) a misrepresentation or omission of material fact; (2) which the defendant knew to be false; (3) which the defendant made with the intention of inducing reliance; (4) upon which the plaintiff reasonably relied; and (5) which caused injury to the plaintiff.'" *Kyszenia v. Ricoh USA, Inc.*, 583 F. Supp. 3d 350, 368–69 (E.D.N.Y. 2022) (citing *Wynn v. AC Rochester,* 273 F.3d 153, 156 (2d Cir. 2001)). "Under New York law, omissions are actionable as a basis for claims of fraud 'only if the non-disclosing party has a duty to disclose.'" *Id.* (citing *Remington Rand Corp. v. Amsterdam-Rotterdam* Bank, N.V., 68 F.3d 1478, 1483 (2d Cir. 1995)). "'A duty to disclose arises where there is a fiduciary relationship between the parties' or 'where one party's superior knowledge of essential facts renders a transaction without disclosure inherently unfair.'" *Catalano v. BMW of N. Am., LLC*, 167 F. Supp. 3d 540, 559 (S.D.N.Y. 2016) (citing *Grand Union Supermarkets of the Virgin Islands, Inc. v. Lockhart Realty Inc.*, 493 Fed. Appx. 248, 252 (3d Cir. 2012)).

Relying on *Garcia v. Chrysler Grp. LLC*, 127 F. Supp. 3d 212  (S.D.N.Y. 2015), GM argues that FXR's fraudulent omission claim must be dismissed because New York courts only impose such a duty "in an arms-length transaction" on a seller with superior knowledge. *Id.* at 237.  In other words, GM states that an original equipment manufacturer, like it, who did not sell or engage in any direct transaction with plaintiff has no duty to disclose.  Although the *Garcia* court concluded that in Kentucky, Michigan and New York, a duty to disclose is only imposed on a seller in an arm's-length transaction with superior knowledge, at least one court in this district and a handful of state courts have interpreted the law differently.  *See Garcia*, 127 F.

25

Supp. 3d at 236.  Indeed, in *Woods v. Maytag Co*., 807 F. Supp. 2d 112, 125 (E.D.N.Y. 2011),

District Judge Spatt found that although the duty to disclose normally arises in the context of

direct business transactions, there have been instances where courts have simply imposed this

duty on manufacturers with exclusive knowledge of a product defect or danger.  *See Woods,* 807

at 125 (Plaintiff can maintain a cause of action against the manufacturer for fraudulent

concealment) (collecting cases)(*see e.g. State by Abrams v. Gen. Motors Corp*., 120 Misc. 2d

371, 374, 466 N.Y.S.2d 124, 127 (Sup. Ct. 1983)("With regard to the allegations of knowledge

by GM of the defective nature of the THM 200, the rule is clear that caveat emptor is no longer

an effective shield. If one party has superior knowledge or has a means of knowledge not

available to both parties, then he is under a legal obligation to speak and silence would constitute

fraud."); *Miele v. Am. Tobacco Co*., 2 A.D.3d 799, 803, 770 N.Y.S.2d 386, 391 (2003)

(recognizing that cigarette manufacturers have a duty to disclose material facts about the dangers

associated with smoking to consumers for the purposes of a fraudulent concealment claim)).

 GM further argues that even if the withholding of information can constitute fraudulent

concealment in New York in the absence of an arms-length transaction, FXR cannot prove that

GM knew about the defect or that FXR relied on any purported omission.  To this end, GM

asserts that its warranty engineer, Steven Pfromm, confirmed that more than 98% of the subject

vehicles had not experienced any problem with oil consumption and only 0.5% needed to have

their pistons replaced as a result of oil consumption.  Def.'s Mem. at 22.  GM also contends that

there is no evidence that it knew FXR's vehicle or its piston rings would fail.  *Id*.

 With respect to FXR's reliance on the alleged omission, GM states that FXR has not

identified or produced any materials from GM that influenced its decision to lease or purchase

the 2013 Sierra.  In fact, GM highlights Vita's deposition testimony that his pre-lease research

was limited to looking up Kelley Blue Book values for earlier model year vehicles.  More importantly, GM maintains that the undisputed evidence is that by the time FXR purchased the car, Vita already knew that the 2013 Sierra was consuming excess oil because he was frequently replacing spark plugs and adding oil.  Def.'s Rule 56.1 Stmt. ¶ 47; Pl.'s Rule 56.1 CounterStmt. ¶ 47; Pl.'s Rule 56.1 Add'l Facts ¶ 51.  Finally, GM notes that FXR was aware of at least one technical service bulletin concerning the vehicle's engine before it purchased the vehicle and allowed Vita to continue to drive it for more than 120,000 additional miles.  Def.'s Rule 56.1 Stmt. ¶ 37.

In response, FXR argues that, at the time of both its lease and purchase of the vehicle, GM knew that the Generation IV engines had an oil consumption defect. Pl.'s Mem. at 1.  FXR claims that GM became aware that the Generation IV engines were suffering from excessive oil consumption soon after the engine was first released.  *Id.*  FXR further argues that GM investigated the matter and learned that the excessive oil consumption was associated with premature wear in the Generation IV engine's piston rings.  *Id.*  FXR also claims that GM made cheap, minor modifications to the engines to address the issue, but never fixed the underlying defect.  *Id.*  In sum, FXR maintains that far from being ignorant about the oil consumption issues, GM knew the Generation IV engine was "a junk engine – from production." *Id.*

Moreover, FXR argues that while it noticed excessive oil consumption before it purchased the vehicle, GM had suggested that the issue would be resolved through a valve cover replacement.  Pl.'s Add'l Rule 56.1 Stmt. ¶ 40.  As such, at the time of purchase, FXR did not know that the vehicle still suffered, and would continue to suffer, from the oil consumption defect.  FXR also notes that GM has tried to downplay the concealed defect by emphasizing that FXR's vehicle was driven for over 70,000 miles before it noticed that the truck was consuming

excessive oil and that FXR used the vehicle for many years to follow.  FXR argues, to this end, that the fact that the Generation IV engines start to breakdown at 70,000 miles is not insignificant to consumers.  Moreover, FXR contends that it relied on the fact that the vehicle would operate without requiring it to constantly change the spark plugs or add oil.  Based on the above, the undersigned finds that there is, at the very least, a genuine issue of material fact as to whether FXR's damages were caused by its reasonable reliance on GM's suggestion that the oil-consumption defect was remedied or easily fixable.  Accordingly, the undersigned respectfully recommends that to the extent GM seeks to dismiss the fraudulent concealment claim, that portion of the motion be denied.

### H.    Consumer Protection Claims

Lastly, FXR alleges a violation of N.Y. General Business Law ("GBL") § 349, New York's consumer protection statute.  "N.Y. GBL § 349 prohibits '[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service' in New York." *Catalano,* 167 F. Supp. 3d at 562 (citing N.Y. GBL § 349). "To prove a claim under § 349, 'a plaintiff must allege that a defendant has engaged in (1) consumer-oriented conduct that is (2) materially misleading and that (3) plaintiff suffered injury as a result of the allegedly deceptive act or practice.'*" Id.* (citing *Orlander v. Staples, Inc*., 802 F.3d 289, 300 (2d Cir. 2015)).  "To constitute a misleading or deceptive act under the statute, the defendant's act 'must be likely to mislead a reasonable consumer acting reasonably under the circumstances.'" *Id.* However, "[a] deceptive practice 'need not reach the level of common-law fraud.'" *Id.* (citing *Stutman v. Chemical Bank*, 95 N.Y.2d 24, 29, 709 N.Y.S.2d 892, 731 N.E.2d 608 (2000).  In addition, "[o]missions are actionable under § 349" and a plaintiff is not required to prove justifiable reliance.  *Id.*  Nevertheless, "a plaintiff seeking compensatory damages must show that

the material deceptive act or practice caused actual, although not necessarily pecuniary, harm." *Id.* (citing *Small v. Lorillard Tobacco Co*., 252 A.D.2d 1, 7, 679 N.Y.S.2d 593 (1st Dep't 1998).

GM argues that FXR's § 349 claim should be dismissed because there is no evidence that GM knew of an alleged oil consumption defect in the 2013 GMC Sierra, much less that this information was exclusive to GM.  GM also argues that there is no evidence that the alleged oil consumption defect would be important to a reasonable consumer deciding which vehicle to purchase.  For the reasons previously stated in connection with the fraudulent omission claim, the Court is unconvinced by this argument.  There is ample evidence in the record for a reasonable jury to conclude that GM was aware that its Generation IV engines were having excess oil consumption problems.  In fact, the record is replete with evidence suggesting that GM actively investigated the problem and tries to take steps to address it.  Although GM may ultimately be successful in proving that they believed the series of modifications they had made resolved the issue, FXR has raised a genuine issue of fact as to whether GM withheld important information concerning its Generation IV engines and whether that information would have altered FXR's determination as to the purchase or lease of its vehicle, or, at least, the amount it was willing to pay for the vehicle.  Accordingly, the undersigned respectfully recommends that to the extent the motion for summary judgment seeks to dismiss the deceptive trade practices claim, the motion also be denied.

## OBJECTIONS

Pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule 72 of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report and Recommendation to file written objections.  Any requests for an extension of time for filing objections must be directed to Judge Azrack prior to the expiration of the fourteen (14) day

period for filing objections.  Failure to file objections will result in a waiver of those objections

for purposes of appeal. *Thomas v. Arn*, 474 U.S. 140, 155, 106 S. Ct. 466, 88 L. Ed. 2d 435

(1985); *Beverly v. Walker*, 118 F.3d 900, 901 (2d Cir. 1997); *Savoie v. Merchants Bank,* 84 F.3d

52, 60 (2d Cir. 1996).

Dated:  Central Islip, New York
           February 27, 2023

                                                    _____/s_____
                                                    ARLENE R. LINDSAY
                                                    United States Magistrate Judge